**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JOSEPH BACEWICZ, ET AL., | : | |
| | : | CIVIL ACTION NO. |
| Plaintiffs, | : | 3:08-CV-1530 (JCH) |
| | : | |
| v. | : | |
| | : | |
| NGM INSURANCE CO., ET AL. | : | AUGUST 2, 2010 |
| | : | |
| Defendants. | : | |

**RULING RE: MOTION FOR SUMMARY JUDGMENT (Doc. No. 97);**
**CROSS-MOTION FOR SUMMARY JUDGMENT (Doc. No. 104)**

## I.    INTRODUCTION

On September 19, 2008, plaintiffs Joseph and Janice Bacewicz (together, "the

Bacewiczes") filed a state court complaint against defendants NGM Insurance

Company and The Main Street America Group, Inc. ("defendants").  The suit alleged

that the defendants breached an insurance contract by denying coverage for damage to

the basement walls in the Bacewiczes' house in Tolland, Connecticut.  The defendants

removed the suit to federal court on October 6, 2008.

On April 13, 2009, the court granted the Bacewiczes' First Motion to Amend their

Complaint.  The Amended Complaint (Doc. No. 28) is the operative complaint for

purposes of this Ruling.[1]  The Amended Complaint contains four counts, three of which

remain pending.  Count One alleges breach of contract, Count Two alleges a breach of

the implied covenant of good faith and fair dealing, and Count Four alleges vicarious

liability against The Main Street America Group.  This court dismissed Count Three,

---

[1] While the Bacewiczes again moved to amend their Amended Complaint on July 30, 2009, that Motion was denied by this court on September 17, 2009.

which alleged unfair and deceptive practices in violation of the Connecticut Unfair Insurance Practice Act, in a June 30, 2009 Ruling.

On February 19, 2010, the defendants moved for summary judgment. On April 12, 2010, the Bacewiczes' cross-moved for partial summary judgment. The court herein considers both Motions. For the reasons stated below, the defendants' Motion (Doc. No. 97) is granted in part and denied in part, and the plaintiffs' (Doc. No. 104) is denied.

## II.    STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009). Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Id. In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Fed R. Civ. P. 56(c); Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." United Transp. Union v. National R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.' " Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "A dispute about a 'genuine

issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir.2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir.2007)); see also Havey v. Homebound Mortgage, Inc., 547 F.3d 158, 163 (2d Cir. 2008) (stating that a non-moving party must point to more than a mere " 'scintilla' " of evidence in order to defeat a motion for summary judgment) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

## III.    FACTUAL BACKGROUND

The Bacewiczes' home is located in Tolland, Connecticut. L.R. 56(a)(1) at ¶ 1. It is insured by a homeowner's policy that was issued by NGM, which is a subsidiary of The Main Street America Group. Id. at ¶ 2, 3. After Janice Bacewicz first noticed a crack in a corner of the dining room in late spring to early summer of 2006, the Bacewiczes hired a "cement/concrete contractor" to inspect it. L.R. 56(a)(2) at ¶ 5; L.R. 56(a)(1) at ¶ 7. The contractor recommended that an engineer perform further inspection on the house. L.R. 56(a)(1) at ¶ 8. An engineer then examined the crack. Id. at ¶ 9. He informed the Bacewiczes that he was unsure as to its cause and advised them to monitor it. Id.

By December 2007, the Bacewiczes observed the crack to have grown larger. Disputed Issues of Material Fact at ¶ 38 ("D.I.M.F."). In January 2008, they hired a company called Budget Dry to perform repairs on "the cracking in the basement walls." Id. at ¶ 41. In preparation for the work, Joseph Bacewicz removed paneling from such walls and noticed "severe horizontal and vertical cracking." Id. at ¶ 42. Soon after starting work, Budget Dry announced that they would be unable to complete the repairs.

3

Id. at ¶ 43.

On March 11, 2008, the Bacewiczes provided a notice of claim to NGM.  L.R. 56(a)(1) at ¶ 14.  While the claim was pending, the Bacewiczes hired an engineer, who concluded that the concrete basement walls would be unable to safely support the weight of the house.  D.I.M.F. at ¶ 44.  In early October 2008, the Bacewiczes began taking steps to replace such walls, in order to "avoid the kind of catastrophic collapse that might have resulted in complete loss of their home, or worse, personal injury or death."  Id. at ¶ 50.  On February 3, 2009, NGM sent the Bacewiczes a letter, informing them that their insurance claim had been denied.  L.R. 56(a)(1) at ¶ 15.

## III.    DISCUSSION

### A.    Count One: Breach of Contract

Count One of the Amended Complaint alleges that, by denying coverage for damage to the basement walls of the Bacewiczes' house, NGM breached the homeowners' insurance policy (hereinafter "the policy" or "the contract") that it had previously entered into with the Bacewiczes.  The defendants argue that (a) the damage to the basement walls of the Bacewiczes' house is not a type of loss covered by the contract; (b) the Bacewiczes' breach of contract claim is time-barred; and (c) the Bacewiczes did not "provide prompt notice of the loss" to NGM, as required by contract.

At the outset, it bears noting that the interpretation of an insurance contract is a legal question that " 'involves a determination of the intent of the parties as expressed by the language of the policy' " Connecticut Ins. Guar. Ass'n v. Fontaine, 278 Conn. 779, 784 (2006) (quoting Hartford Casualty Ins. Co. v. Litchfield Mutual Fire Ins. Co., 274 Conn. 457, 462-63 (2005)).  Indeed, "[a]n insurance policy is to be interpreted by

4

the same general rules that govern the construction of any written contract." <u>Zulick v.</u> <u>Patrons Mut. Ins. Co.,</u> 287 Conn. 367, 372-73 (2008).

The court recognizes that "provisions in insurance contracts must be construed as laymen would understand [them] and not according to the interpretation of sophisticated underwriters and that the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view." <u>Vermont</u> <u>Mut. Ins. Co. v. Walukiewicz,</u> 290 Conn. 582, 592 (2009) (internal quotation marks and citation omitted). If language in an insurance contract is unambiguous, it "must be accorded its natural and ordinary meaning, and the courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties." <u>Jacaruso v. Lebski</u>, 118 Conn. App. 216, 233 (2009). "Contract language is unambiguous when it has a definite and precise meaning[,] concerning which there is no reasonable basis for a difference of opinion." <u>Isham v. Isham</u>, 292 Conn. 170, 235-36 (2009) (internal quotation marks, citation, and ellipses omitted).

To the extent the language of an insurance policy is ambiguous, such language must be construed against the insurance company, who was the drafter of the policy. <u>See</u> <u>Springdale Donuts, Inc. v. Aetna Cas. & Sur. Co.</u>, 247 Conn. 801, 806 (1999). "Where contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered, and the determination of the parties' intent is a question of fact." <u>Taravella v. Town of Wolcott</u>, 599 F.3d 129, 143 (2d Cir. 2010) (citing <u>Barton v.</u> <u>City of Bristol</u>, 291 Conn. 84, 93 (2009)).

1.     Whether the Loss was Covered by the Contract

The Bacewiczes allege that NGM breached Section 8 of the policy, entitled "Collapse."  That section states, in relevant part, that "[w]e insure for direct physical loss to covered property involving the collapse of a building or any part of a building caused only by one or more of the following . . . b. hidden decay."  Section 8 also includes two limitations that are applicable to the court's analysis.  First, it states that "[l]oss to . . . foundation. . . is not included . . . unless the loss is a direct result of the collapse of a building."  Second, it provides that "[c]ollapse does not include settling, cracking, shrinking, bulging or expansion."  NGM argues that the loss to the Bacewiczes' basement walls is not covered by the contract because (a) such loss was to the "foundation" of the house; (b) the damage claimed consisted only of "swelling, cracking and bulging," and thus a "collapse" did not occur; (c) such loss was not caused by "hidden decay"; and (d) such loss was attributable to water damage.  The court will address each argument in turn.

a.     Damage to Foundation

NGM first argues that Section 8 does not cover the Bacewiczes' loss because that section explicitly excludes from coverage any loss to the foundation of the house, unless such loss was a direct result of the collapse of a building.  Here, there is no dispute that the loss to the Bacewiczes' basement walls was not a direct result of the building's collapse.  To the contrary, it is the basement walls themselves that are alleged to have "collapsed."  NGM argues that the basement walls are part of the "foundation" of the house.  The Bacewiczes argue that the foundation consists not of the basement walls, but instead of the house's "footings," which have been described

6

as a "concrete base" atop of which the basement walls rest.  See Deposition of Joseph Bacewicz at 17:9-13.  There is no dispute that such footings exist.

It is true that much of the evidence in this case indicates that the terms "basement walls" and "foundation walls" are used interchangeably.  See, e.g., Deposition of David Grandpre at 45:5-6.  However, at least one other court considering a similar question has held that "a person of ordinary intelligence could reasonably conclude . . . that the term 'foundation' refers only to the piece of concrete at the base of the wall," rather than a concrete basement wall itself.  Turner v. State Farm Fire and Cas. Cos., 614 So.2d 1029, 1032 (Ala. 1993).  Moreover, some of the evidence in this case appears to indicate that there are multiple definitions of the term "foundation."  Deposition of David Grandpre at 45:13-16 ("Q.  Do you consider the walls at the Bacewicz property which you understand deteriorated to be part of the foundation of the building?  A.  By some definitions, yes.") (emphasis added).  While the defendants argue that the Bacewiczes' construction of the term "foundation" is implausible in the context of Section 8, because "[f]ootings do not collapse," Reply at 5, the court is unpersuaded.  As explained below, the term "collapse" does not necessarily mean a sudden and catastrophic falling down.  Further, the defendants have cited no evidence indicating that improperly constructed footings cannot "collapse," in the sense of suffering substantial structural impairments.  Beach v. Middlesex Mut. Assur. Co., 205 Conn. 246, 252 (1987) ("'[C]ollapse' is sufficiently ambiguous to include coverage for any substantial impairment of the structural integrity of a building.").

In sum, the term "foundation," as it is contained in the policy at issue in this case, is reasonably susceptible to more than one reading.  The court agrees with the

Bacewiczes that a reasonably jury could find that the basement walls of the Bacewiczes' house did not constitute the "foundation" of the house.

b.    Exclusion for Cracking and Bulging

NGM argues that, even assuming the Bacewiczes' basement walls are not part of the "foundation" of the house, summary judgment must be granted because the contract does not cover loss caused by "collapse" in the form of "swelling, cracking and bulging."  Indeed, it does not appear to be disputed that the basement walls--before they were repaired--cracked and bulged because they were unable to withstand "the lateral pressure of the earth surrounding the basement."  Mem. in Opp. at 8.  The Bacewiczes maintain, however, that while their basement walls cracked and bulged, such cracks and bulges do not constitute the "collapse" at issue per se.  Rather, the Bacewiczes argue that the cracks and bulges that appeared in their basement walls were merely superficial symptoms of a "deterioration and decay in the chemical composition of the concrete" out of which the basement walls were constructed.  Mem. in Opp. at 9.  Moreover, they contend that the clause excluding from coverage loss caused by "collapse" in the form of swelling, cracking, or bulging cannot be reasonably read in the manner suggested by defendants, because all "collapses," by definition, "involve the separation or cracking of materials" and result in structures "bent or twisted out of their original design configuration."  Id. at 8.

In Beach v. Middlesex Mut. Assur. Co., 205 Conn. 246 (1987), the Connecticut Supreme Court considered a similar question in the context of a homeowner's insurance policy containing the following language:

This policy does not insure against loss . . . [u]nder Coverages A and B . . . 1. by

. . . settling, cracking, shrinkage, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings . . . unless . . . collapse of a building . . . not otherwise excluded ensues, then this policy shall cover only such ensuing loss.

Id. at 250.  The Beach court rejected the defendant's argument that "the term 'collapse' in this policy unambiguously contemplates a sudden and complete falling in of a structure."  Id.  First, the court held that the word "collapse" encompasses both "a catastrophic breakdown" and "a breakdown or loss of structural strength."  Id. at 251.  In so holding, the court noted that, "[i]f the defendant wished to rely on a single facial meaning of the term 'collapse' as used in its policy, it had the opportunity expressly to define the term to provide for the limited usage it now claims to have intended."  Id. Second, the court rejected the defendant's argument that the portion of the contract excluding liability for loss by " 'settling, cracking, shrinkage, bulging or expansion' . . . narrow[ed] the purview of 'collapse' to casualty of a sudden and cataclysmic nature." Id.

Like the contract language at issue in the Beach case, the Bacewiczes' policy excludes "settling, cracking, shrinking, bulging, or expansion" from its definition of "collapse."  As in Beach, the court concludes that the term "collapse," as that term is used in Section 8 of the Bacewiczes' policy, is reasonably susceptible to a reading that includes the type of damage that occurred to the Bacewiczes' basement walls.

To begin, the court agrees with the Bacewiczes that, even if the contract unambiguously provides that "cracking" and "bulging" do not constitute "collapse" per se, such is not dispositive of the breach of contract claim in this case.  The Bacewiczes argue that the chemical decomposition of the basement walls--rather than the cracking

or bulging itself--constitutes the "collapse" that caused the loss.  There is evidence in the record indicating that such chemical decomposition occurred.  One report, for instance, mentions "oxidation of iron sulfide minerals . . . present within the course aggregate particles" of the concrete, Exh. EE at 6, and David Grandpre, an engineer, testified that the walls had deteriorated as a result of an alkali-silica reaction. Deposition of David Grandpre at 56:8-11. Further, there is evidence that such decomposition led to a "substantial impairment" in the structural integrity of the basement walls.  Id. at 56:12-18.

Second, as in Beach, the court agrees that a reasonable jury could find that the term "collapse," as it is contained within the Bacewiczes' policy, is not limited to a situation of sudden and catastrophic loss.  The court agrees that the term " 'collapse' is sufficiently ambiguous to include coverage for any substantial impairment of the structural integrity of a building."  Beach, 205 Conn. at 252.  Moreover, if NGM had intended to limit collapse coverage to situations involving sudden and catastrophic loss, it presumably could have done so.  The Bacewiczes claim that the defendants breached the provision in the policy that expressly provides coverage for collapse caused by "hidden decay."  In interpreting a policy containing similar language, the Second Circuit recently noted that, "by [its] very nature, hidden decay . . . occur[s] slowly and not as a sudden destructive force."  Dalton v. Harleysville Worcester Mut. Ins. Co., 557 F.3d 88, 93 (2d Cir. 2009).  While, as the Second Circuit noted, some insurance contracts may be read to mean that the term " 'collapse' . . . requires a sudden destructive force, that is surely not the case where the policy in question defines collapse in a manner which expressly includes conditions that occur only

slowly." Id.

In light of the foregoing, the court concludes that the language in Section 8 of the policy, which states that "collapse" does not include, inter alia, cracking and bulging, is susceptible to more than one reasonable interpretation. The court agrees with the Bacewiczes that a reasonable jury could conclude that such language simply indicates that "a crack or bulge, by itself, does not make for a collapse." Id. at 9. That cracking and bulging may have been symptomatic of chemical decomposition occurring within the concrete of the basement walls of the Bacewiczes' house would not, in the court's view, preclude a reasonable jury from concluding that NGM is liable for failing to cover any substantial impairment to structural integrity caused by such decomposition. Indeed, as the Bacewiczes note, it is difficult--if not impossible--to imagine any "collapse" that did not at some point manifest itself in the form of cracks, bulges, or other physical deformities.

### c. Hidden Decay

NGM next argues that it is not liable for the damage to the Bacewiczes' basement walls because such damage was not caused by "hidden decay." NGM maintains that such damage was not "hidden" and should not be considered to constitute "decay."

The court first concludes that a reasonable jury could find that the damage to the Bacewiczes' basement walls constituted "decay." While the term "decay" is not defined in the policy, Webster's II New College Dictionary defines that term to include "[g]radual deterioration to an inferior state, as of health or mental capability." As noted above, there is evidence in the record indicating that the Bacewiczes' basement walls were

11

weakened due to a chemical reaction, possibly an oxidation of iron sulfide minerals, or an alkali-silica reaction. In the court's view, the term "decay" might reasonably be interpreted by a lay person to encompass damage to concrete caused by such chemical reactions.

In addition, the court concludes that a reasonable jury could find that the damage to the Bacewiczes' basement walls was "hidden." NGM argues that such damage was not "hidden" because Janice Bacewicz first discovered a crack in her house as early as mid-2006. Mem. in Supp. at 13. However, there is evidence in the record that some types of cracks within concrete are "pretty common," Deposition of David Grandpre at 57:7-8, and that the Bacewiczes did not become aware that the walls in their basement had seriously deteriorated until Joseph Bacewicz removed interior paneling from such walls in or about February 2008. See L.R. 56(a)(2) at ¶ 42; Deposition of Joseph Bacewicz at 53:3-16. Accordingly, the court concludes that, even if not every single physical manifestation of the decay in the Bacewiczes' house was concealed from plain view, there is evidence on which a reasonable jury could find that the "decay" that occurred was "hidden," within the meaning of the policy.

d.    Water Damage

NGM next argues that summary judgment must be granted on the breach of contract claim because the policy does not cover loss caused by "[w]ater below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk driveway, foundation . . ." See Mem. in Supp. at 14. NGM contends that the loss to the Bacewiczes' house was caused by water below the surface of the ground. Indeed, there is no dispute that the policy does not cover loss

12

caused by such water,[2] and the record contains ample evidence that the damage to the Bacewiczes' basement walls was indeed caused by water on the surface of the ground.

NGM points to, for example, a report prepared by engineer Douglas Fisher indicating that "[t]he failure to apply a water proofing membrane to the exterior wall surface allowed exterior sources of water to come into contact with and migrate through the concrete." Defs' Exh. I. Both sides also seem to agree that water may be necessary to facilitate an alkali-silica reaction or an oxidation of the sulfides within the concrete comprising the basement walls, chemical reactions which may have led to the deterioration of those walls.

The defendants, however, have raised an issue of material fact that precludes the court from granting summary judgment. While Fisher, the defendants' engineer, indicated that water <u>outside</u> the basement walls would be necessary to facilitate the deterioration of those walls, the plaintiffs' expert, David Grandpre, indicated that "the initial water in the concrete mix would be sufficient for the [alkali-silica reaction] process to begin." Defs' Exh. I.[3] There is no dispute that water contained in the concrete mix itself would not trigger the water damage exception to the coverage provided by the policy. Summary judgment is thus denied on the basis of the water damage exception to the policy.

---

[2] "Water Damage," as that term is used in the policy, is defined fully as:
(1) Flood, surface water, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;
(2) Water which backs up through sewers or drains or which overflows from a sump; or
(3) Water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure." Defs' Exh. A at 27.

[3] The Bacewiczes have cited pages 73 and 74 of Grandpre's deposition for this proposition. D.I.M.F. at ¶ 62. These pages, however, were apparently never submitted to the court by the plaintiffs.

2.     Timing Restrictions to Suit

Beyond arguing that the policy does not govern the type of loss suffered by the Bacewiczes, the defendants maintain that the breach of contract claim is time-barred because the claim was not filed "within the required time specified by the policy."  Mem. in Supp. at 14.  Paragraph 8 of the "Conditions" section of the policy states that, "[n]o action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss."  Contractually-imposed time limitations to suit have long been recognized as enforceable by both federal and Connecticut courts.  See Air Brake Systems, Inc. v. TUV Rheinland of North America, Inc., --- F. Supp. 2d ----, 2010 WL 1194503, at *6 (D. Conn. 2010) (collecting cases). The Bacewiczes' breach of contract action was originally filed in state court on September 18, 2008.

While the parties dispute when the one-year limitations period began to run, they appear to agree on the standard to be applied.  While there is no Connecticut precedent on point, the First Circuit, in Parker v. Worcester Ins. Co., 247 F.3d 1 (1st Cir. 2001), predicted that the Connecticut Supreme Court would employ the "discovery rule" in circumstances such as these.  Id. at 5 ("Making our best guess, we are inclined to think that the Connecticut Supreme Court would probably take this view, given the protective attitude toward the insured displayed in Beach."). Under such approach, the limitations period begins to run only when "a reasonable person would have learned of the injury or loss."  Id. at 4.

Using this rule, the question for the court is whether the limitations period began to run before September 23, 2007, which is one year before the date on which the

14

defendants were served in this action.[4]  The defendants argue that, using the "discovery rule" approach, the one year limitations period began to run, at the latest, in early 2007. The Bacewiczes, on the other hand, maintain that the period began to run, at the earliest, in December 2007, which is when Janice Bacewicz allegedly noticed "the enlargement of the crack" in her house.  It is undisputed that Janice Bacewicz first noticed cracking in the house in mid-2006, L.R. 56(a)(1) at ¶ 5, that the Bacewiczes arranged for a contractor and an engineer to examine the crack during the summer of 2006, id. at ¶ 7, 8, that Janice Bacewicz noticed that the problems had become worse by winter of 2007, id. at 10-11, and that no action was undertaken to repair the basement walls until 2008.  Id. at ¶ 13.

Parker involved a similar scenario.  There, the plaintiffs "began to notice hairline, mostly horizontal cracks in the concrete walls of the basement" almost immediately after moving into a new house in 1985.  247 F.3d at 2.  By 1996, the cracks had grown larger, and "the basement wall seemed to be developing a sandy texture, as if it were disintegrating."  Id.  In November 1997, after the insurer refused to cover the damages, the plaintiffs paid out of pocket to repair them.  Id. at 3.  The plaintiffs brought suit against the insurer in February of 1998, alleging a breach of the "collapse" portion of the policy.  The question for the court was when the one-year limitations period, as provided by the contract, began to run.  The First Circuit first noted that, using the discovery rule, the period began to run only when the plaintiffs knew or should have

---

[4]  "In Connecticut, an action is commenced on the date of service of the writ upon the defendant." Hillman v. Town of Greenwich, 217 Conn. 520, 527 (1991). At oral argument, both parties agreed that September 23, 2007 is the date on which the statute of limitations clock began to run.

known that their property had suffered loss covered by the "collapse" provision; that is, when they knew or should have known about a "substantial structural flaw" in the building.  Id. at 5.  While the court noted that the plaintiff "conceivably . . . should have known by mid-1996" that the structural integrity of the house had been seriously compromised, it held that "a reasonable factfinder could draw varying conclusions as to whether a reasonable person should have known from [the facts known to the plaintifffs at that date] that a substantial structural flaw was present or at least likely."  Id.

In this case, the court similarly concludes that a reasonable jury could draw different conclusions as to whether a reasonable person should have known before September 23, 2007, that a substantial structural impairment was present in the Bacewiczes' house.  The Bacewiczes were aware of cracking in their house by that date, L.R. 56(a)(2) at ¶ 5, but it is far from clear whether a reasonable person would have known that such cracking was a sign of collapse.  "A judgment on undisputed facts that a reasonable person 'should have known' something is (like negligence) a legal conclusion; but it is one of those conclusions that most courts leave to juries where, as here, reasonable juries could differ."  Parker, 247 F.3d at 5.  On this basis, the court declines to grant summary judgment on the ground that the suit is time-barred.

> 3.    Whether the Bacewiczes Timely Notified NGM of the Damage to their Basement Walls

Lastly, the defendants argue that summary judgment must be granted on the breach of contract claim because the Bacewiczes failed to give NGM "prompt notice" upon "the loss to" their house, as required by the contract.  It does not appear to be

disputed that the Bacewiczes first provided an "initial notice of a claim" to NGM on March 11, 2008. However, whether such notice was prompt depends on when a reasonable person would have known that the cracking to the Bacewiczes' house was a sign of collapse. As in the discussion of whether this suit was commenced within the limitations period provided by the contract, the court concludes that a reasonable jury could find that the Bacewiczes promptly notified NGM of the loss to their house.

B.     Count Two: Breach of the Implied Covenant of Good Faith and Fair Dealing

In Count Two, the Bacewiczes allege that the defendants breached the implied covenant of good faith and fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Warner v. Konover, 210 Conn. 150, 154 (1989) (internal quotation marks and citation omitted). "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith. . . . Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose." De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 433 (2004) (internal quotations marks omitted).

The Bacewiczes have offered three bases for their claims contained in Count Two. First, they argue that the defendants denied their claim for collapse coverage on

the basis of water damage, when in fact no evidence of water damage existed. Second, they argue that the defendants acted unreasonably and in bad faith by "delaying the issuance of a formal denial of coverage until after the expiration of the suit limitation period," presumably to create an "untimely filing" defense. Third, they argue that the defendants accused the Bacewiczes of making fraudulent misrepresentations, without a factual basis to do so.

1.     Water Damage

As to the allegation that the defendants were dishonest in their denial of the Bacewiczes' insurance claim on the basis of water damage, the court concludes that the record cannot support a claim for breach of the implied covenant of good faith and fair dealing. The record is devoid of any evidence indicating that the defendants acted dishonestly or in bad faith in citing water damage as the reason for the denial of the Bacewiczes' claim. Moreover, whether or not the damage to the Bacewiczes' house was actually caused by water damage, this court, in its discussion of the breach of contract claim, noted that the record contains evidence on which a reasonable jury could make such a finding. <u>See</u> Section III.A.1.c, <u>supra</u>.

2.     Untimely Filing Defense

Similarly, the record cannot support a claim for breach of the implied covenant of good faith and fair dealing on the basis that the defendants waited until February 2009 to deny the Bacewiczes' claim of coverage, in order to create a defense of untimely filing. While it is undisputed that the Bacewiczes' claim was denied on that date, there is nothing in the record that suggests that the defendants made a "decision" to wait until that date to deny coverage, for the purpose of creating such a defense. The record

shows that the Bacewiczes notified NGM of their claim in March of 2008, that an NGM engineer prepared a written report in May 2008, and that the Bacewiczes submitted a formal proof of loss in late September 2008.

In support of this claim, the Bacewiczes highlight the defendants' refusal to accommodate their request to extend the contractual suit limitation period. Mem. in Opp. at 28; <u>see</u> <u>also</u> Pls' Exhs. OO; PP. However, the September 18, 2008 letter in which the defendants' lawyer denied that request in no way indicates bad faith. Such letter signals that the defendants, at the time, were still investigating the date on which the Bacewiczes knew or should have known that their basement walls had "collapsed." Pls' Exh. PP. While the letter demonstrates that the defendants thought it possible that the Bacewiczes had already waited too long to sue over the denial of coverage to their basement walls, the letter contains no hint of a dishonest or sinister purpose.

In sum, the record lacks any evidence that supports the Bacewiczes' allegation that the defendants purposefully delayed the investigation into the Bacewiczes' claim for the purpose of creating an untimely filing defense. No reasonable jury, therefore, could find a breach of the implied covenant of good faith and fair dealing on this basis.

3.      Accusations of Fraudulent Misrepresentations

The court reaches the same determination as to the Bacewiczes' claim that defendants accused them of making fraudulent misrepresentations, without a basis to do so. Such accusation appeared in the defendants' letter denying coverage to the Bacewiczes for the damage to their basement walls. That letter stated that, "[b]ased upon our investigation, we have concluded that your clients concealed and misrepresented material facts or circumstances and made false statements during the

presentation of their claim."  Defs' Exh. A.

The basis for such accusation is as follows: On September 29, 2008, a contractor named Dean Soucy filed a building / zoning permit application with the Town of Tolland, seeking to "replace [the] foundation wall" of the Bacewiczes' home.  Defs' Exh. M.  On September 30, the Bacewiczes executed a proof of loss with NGM, claiming a recovery of $226,319 on their policy.  Defs' Exh. N. On October 1, the Bacewiczes signed an agreement with Dean Soucy, indicating that the repairs to their house would cost $112.000.  Defs' Exh. H.  Based on their belief that the Bacewicizes knew they would be employing Dean Soucy at the time the proof of loss was executed and, due to the fact that the amount claimed on the proof of loss was more than double that indicated in the October 1 agreement, NGM apparently believed that the Bacewiczes "misrepresented the value of their claim in the September 30, 2008 proof of loss."  Mem. in Supp. at 22.

The Bacewiczes maintain that they "have never asserted that they are entitled to any more than the cost of repairing their home," and that "the proof of loss was based upon a cost estimate made by their contractor."  Mem. in Opp. at 29.  The record contains support for these assertions.  See id. (summarizing deposition testimony).  However, these facts, even if true, do not indicate that the defendants acted with a dishonest or sinister purpose in accusing the Bacewiczes of making false representations on their proof of loss.[5]  The Bacewiczes argue that the defendants

---

[5]  While the plaintiffs state that "[i]t was clear that at the time the defendants denied the claim they knew that the proof of loss was based on estimated costs," rather than actual costs, the plaintiffs cite nothing in support of this assertion.  Mem. in Opp. at 30; D.I.M.F. at ¶¶ 75-77.

lacked any factual basis that would justify an accusation of making false statements. However, the court agrees with the defendants that, based on the timing of the events noted above and the large disparity between the amount stated on the proof of loss and that stated on the contract executed the following day, the defendants had a reasonable basis on which to make such a statement.  In sum, the court concludes that no reasonable jury could find that the defendants breached the implied covenant of good faith and fair dealing, on the basis that they accused the Bacewiczes of making false representations on their proof of loss.

     C.    <u>Count Four: Vicarious Liability</u>

Count Four alleges that The Main Street America Group ("MSA"), NGM's parent corporation, is vicariously liable for NGM's conduct in connection with the Bacewiczes' homeowners' insurance policy, because MSA, as the sole shareholder of NGM, exercised control over NGM's operations.  <u>See</u> Am. Comp. at ¶ 45-46.  The defendants argue that summary judgment must be granted on Count Four because the record is devoid of facts on which a reasonable jury could find that MSA is liable for the actions of NGM.  Mem. in Supp. at 22.

Under Connecticut law, "it is a fundamental principle of corporate law that the parent corporation and its subsidiary are treated as separate and distinct legal persons even though the parent owns all the shares in the subsidiary and the two enterprises have identical directors and officers."  <u>SFA Folio Collections, Inc. v. Bannon</u>, 217 Conn. 220, 232 (1991) (internal quotation marks and citation omitted). Connecticut courts therefore

     disregard the corporate structure and pierce the corporate veil only under

exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice.

Id. at 230 (internal quotation marks and citation omitted).

Connecticut "recognizes two theories under which it will permit the protection of

the corporate structure to be set aside, the instrumentality rule and the identity rule."

Labbe v. Carusone, 115 Conn. App. 832, 838 (2009).  The Bacewiczes argue that only

the "identity rule" is applicable to this case.  Mem. in Opp. at 31.  Under that rule,

If [the] plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise.

Id.[6] (quoting Angelo Tomasso, Inc. v. Armor Const. & Paving, Inc., 187 Conn. 544, 553-

54 (1982); see also SFA Folio Collections, 217 Conn. at 232 ("[T]he separate corporate

entities or personalities of affiliated corporations will be recognized, absent illegitimate

purposes, unless: "(a) the business transactions, property, employees, bank and other

accounts and records are intermingled; (b) the formalities of separate corporate

procedures for each corporation are not observed . . . (c) the corporation is

inadequately financed as a separate unit from the point of view of meeting its normal

obligations . . . (d) the respective enterprises are not held out to the public as separate

---

[6] In contrast, " '[t]he instrumentality rule requires . . . proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [the] plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of . . . .' "  Labbe, 115 Conn. App. at 838 (quoting Angelo Tomasso, Inc., 187 Conn. at 553-54 (1982)).

enterprises; (e) the policies of the corporation are not directed to its own interests primarily but rather to those of the other corporation.") (internal quotation marks and citation omitted).

In support of Count Four, the Bacewiczes have submitted evidence, consisting of deposition testimony, that MSA and NGM are, to some extent, "intertwined."  Mem. in Opp. at 31; see also Deposition of Hilda Ortiz at 7:12-14 (describing MSA and NGM as "[o]ne in the same"); Deposition of Judith Banes at 9:13-16 (stating that NGM is "under the umbrella of the Main Street America Group"); Deposition of Ronald Callahan at 17:7-9 ("Q. Does she work for National Grange or does she work for Main Street America Group?  A. We all kind of work for both."); Deposition of Joel Heller at 9:12-14 ("I view [NGM and MSA] as being one in the same since NGM is a subsidiary of Main Street America Group.").  However, the record contains no evidence of any exceptional circumstance that would permit the court to pierce the corporate veil.  There is no indication, for example, that the business transactions, property, and bank accounts of MSA and NGM are intermingled; that NGM is inadequately financed as a separate entity; or that NGM and MSA are not held out to the public as separate entities.  Even if, as the Bacewiczes allege, MSA owns all of the shares in NGM and exercises control over NGM operations, Am. Comp. at ¶ 44-45, "[s]uch control . . . is no more than a normal consequence of controlling share ownership."  SFA Folio Collections, Inc., 217 Conn. at 232.

Because there is no evidence in the record that would permit a reasonable jury to "pierce the corporate veil" and find MSA liable for NGM's alleged misconduct, summary judgment is granted to the defendants on Count Four.

### D.    Plaintiffs' Cross-Motion for Partial Summary Judgment

The plaintiffs have cross-moved for summary judgment on their breach of contract claim.  As stated in section III.A, <u>supra</u>, reasonable juries could differ as to whether NGM breached the insurance contract that is the subject of this case.  Thus, for the reasons stated in the court's discussion of Count One, the Cross-Motion for Partial Summary Judgment is denied.

## IV.    CONCLUSION

For the foregoing reasons, the defendants' Motion for Summary Judgment (Doc. No. 97) is **granted in part**.  It is granted as to the claims for breach of the implied covenant of good faith and fair dealing and vicarious liability, and denied as to the claim for breach of contract.  The plaintiffs' Motion for Partial Summary Judgment (Doc. No. 104) is **denied**.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 2nd day of August, 2010.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge